S. B. Strong, J.
The plaintiff in error was tried on an indictment charging him with the murder of his wife by poison, at a Court of Oyer and Terminer held in the city and county of Hew York. The trial was commenced on the 7th day of March, 1859, and was continued by adjournment from day. to day until the 26th day of that month, when it resulted in a verdict of guilty. The jurors impanneled to try the action were permitted by the presiding judge (who alone constituted the court), with the consent of the prisoner, to separate on each adjournment, until they received the charge of the court, when they continued together until they rendered their verdict. A motion for a new trial was made before the same court by the prisoner’s counsel, for alleged irregularities and errors committed on the trial, which was denied, and the prisoner was thereupon sentenced to be executed. A writ of error was subsequently brought, and the judgment record, which had been drawn by the counsel for the prosecution without any request from the prisoner, and a bill of exceptions, signed by the judge, with various affidavits and certificates attached pursuant to the requisitions of a certiorari, were returned to the Supreme Court, at a general term held in the first district, by which tribunal the conviction was affirmed. The case was then brought before this court by a writ of error, and we have submitted to us all the papers which were before the Supreme Court, and also a certificate, signed by the judge who held the Court of Oyer and Terminer, given after the adjournment of that tribunal, and while the case has been pending in this court, stating the constant attendance of the prisoner in court during the entire trial.
It was intimated by the counsel for the prosecution, that this court is confined to the consideration of the transcript of the indictment, bill of exceptions, and judgment of the Court of Oyer and Terminer, which the clerk of that court is required to return by statute. (2 R. S., § 20, 740, 741.) Probably it was not designed to bring before either the Supreme Court or the Court of Appeals questions of irregularity, but it was intended that, upon all such points, the decision of the court *551 in which the trial was had, upon a motion for a new trial, should be final and conclusive. But it was decided in this court, in the late ease of The People v. Cancemi (18 N. Y., 128), that, in a capital case, matters in addition to what are included in the clerk’s return may be brought up on a certiorari alleging diminution, and that any question materially affecting the rights of the accused resulting from the facts stated in, or appearing from the return to, such writ is proper for our consideration. Within that decision we deem it right to consider all the material questions raised upon the returns to both the writ of error and the certiorari.
The counsel for the prisoner objected to the reception and consideration of the judge’s certificate stating the constant attendance of the prisoner during his trial, oh the grounds that it was granted after the final adjournment of the Court of Oyer and Terminer, that it was not produced before the Supreme Court, and was not returned here in obedience to any writ Probably these objections are sufficient to require the rejection of the certificate, but from the view which we take of the question which it was intended to meet, and which will be stated hereafter, it is wholly immaterial whether it is received or rejected.
It was contended, on the argument, that the judgment record was not authorized by the statute (2 R. S., 738, § 4), as it had not been drawn up upon the requisition of the prisoner. That statute renders it obligatory upon the district attorney to make up a record of the judgment when required to do so by the defendant. The reason for that enactment was because it is not customary for the district attorney to prepare a formal judgment record in any criminal case, but it is made the duty of the clerk to enter such judgment fully in his minutes. (Id., § 5.) There can be no doubt, however, but that the people have the same right to make up a judgment record in their favor as exists in the eases of other parties. The positive requisition of an act, in a particular instance, is no evidence that it cannot be legally performed in others.
*552 It was also objected to the judgment record that it does not state the constant presence of the prisoner during the trial, which is positively required by the statute. (2 R. S., 734, § 18.) The objection is not that the prisoner was not actually present, but that his presence is not apparent from the record; and, therefore, the certificate of the judge, to which I have before alluded, is wholly immaterial. No doubt a material omission in the record cannot be cured by a separate certificate. The only remedy in such case is by an amendment which, in criminal cases (to which the statute of jeofails is mainly inapplicable) can only be made by .an order of the court. The judgment record, in this case, states that the prisoner came into court at the commencement of the trial and was at tide bar when the jurors were sworn, and it then sets forth that, forasmuch as it appeared that justice could not be done if the court should proceed without interruption upon the said trial, the same was continued by adjournment from day to day until the 26th of March, when the jury rendered their verdict. The allegation of a continuance of the trial sufficiently indicates that it was with the incidents before described, of which the presence of the prisoner was one. Besides, when facts are stated sufficient to confer jurisdiction upon a court of such high attributes, the inference is that as to its continued proceedings omnia rite acta. Hence, it is not usual in either civil or criminal cases to state on the record the occurrence of the necessary incidents between the selection of the jury and the rendition of their verdict. There is not, so far as my researches have extended, a single precedent of a judgment record in which such particulars are stated. The forms of our solemn records constitute a portion of the common law, and no addition can be necessary except in pursuance of some statutory requisition. The record, in this case, contains another statement which is sufficient' to indicate the constant presence of the prisoner. It sets forth that when he was asked whether he had or knew anything to say why judgment should not be pronounced against him, he answered that he had nothing further “ than as before he had said *553 and it is apparent, as well from the judgment record as from the bill of exceptions, the minutes of the clerk and the written objections of the counsel, that he had not before urged or alleged that he was absent during any part of the trial. We are satisfied that the record states all that is necessary to warrant the inference that the prisoner was present daring the entire sitting of the court, from the time when the jury were called until and when the verdict was rendered.
The next and the most material question in the case is, whether the trial was vitiated by the separation of the jury, which was with the consent of the prisoner and by the express permission of the court. It may be well to state here that all the separations to which objections have been interposed by the counsel for the prisoner were before the case had been submitted to the jury under the final charge of the court, and that the case is free from any imputation of impropriety against the entire body, or either of the jurors, during their deliberations. This question has no reference to the jurisdiction of the court, or, as in the case of the People v. Cancemi, the organization of a constitutional jury, nor to any matter which could be taken into consideration by the court or jury in the determination of the issue on trial. It is simply as to the mode of procedure. In all questions of prac tice where there are no statutory directions (and there is confessedly none adverse to the course adopted by the court in this case), it is competent for the court to make and (as the public convenience or ends of justice may require) alter their rules of procedure. Many antiquated rules have been abolished, and others altered, to suit the altered circumstances and character of the people, and the changes in the manner of administering the laws. The power of the courts to make them has never been seriously questioned. It has been exerted repeatedly in reference to the manner in which trials were conducted. In the early stages of the legal history of England many of the rules regulating the conduct of the court and jury on trials were very strict. Among others there could be no adjournment on trials for felonies; the jurors were *554 excluded from all communication with others than members and officers of the court, during the trial, and they were not permitted to separate, after they had been charged by the court, until they had rendered a verdict. The last mentioned rule was carried so far that, if the jury failed to agree during the session of the court in the county where the trial was had, they were conveyed into the county where the presiding judge next held his court, and were held in confinement until they rendered a verdict. There were reasons for these rules at an early day which do not now exist. The jurors were then comparatively ignorant, subject to the control of their superiors, and easily led astray. They had but faint notions of popular rights, and submitted to restrictions which would not now be tolerated. Trials were brief, seldom occupying an entire day. As was remarked by Lord Kenton in the case of The King v. Stone (6 D. & E., 530), “it was left to modern times to bring forward cases of extraordinary length.” The trial, of the case under consideration occupied seventeen days. The trial before me of the last suit against the owners of the steamer Henry Clay, which was burnt on the Hudson river, occupied three weeks. To deprive jurors of all association with their families, to seclude them from society, to interrupt their attention to their ordinary business, and to deprive them of the opportunity to take such exercise as may be, and often is, necessary for the preservation of their health, for so long a period, is intolerably oppressive, and can be justified only by absolute necessity. The men of extensive business will not, the infirm cannot, submit to the confinement. The consequences are, that if the ancient rule forbidding the separation of jurors, during a trial, should be enforced at the present day, the public would lose the services of the most reliable jurors, and a weary burden would fall exclusively upon those who are unable to pay their fines, and to whom and their families the entire loss of time is a serious evil. Where jurors are subjected to a long confinement their patience is exhausted, their power of endurance is weakened and their attention to the evidence is relaxed, and they are unable to give the noces *555 sary consideration to a long and often complicated case, involving the life of a fellow-man, when it is finally committed to them. Jurors are generally charged, in such cases, to hold no conversations on the subject of the trial, but in the long and dreary nights of their confinement a compliance with such charge is very difficult. It is well known that they do freely discuss the evidence which they have heard during the day, and opinions are formed and expressed which, in the subsequent stages of the trial often embarrass them, and sometimes lead to a wrong conclusion or a final disagreement. The reasons usually assigned for such confinement of the jurors are, that if they should be allowed to separate, and mingle freely with society, they might be exposed to attempts, by unprincipled men, to bribe them, or to mislead them by oral communications. Attempts to bribe jurors would be very hazardous. The proponent may mistake the character of the juror whom he attempts to corrupt, and if so he would be exposed to detection, disgrace, and severe punishment. If he should prevail it could only be with but one, or a small number, of the jurors, and that would not affect the others. It might lead to a disagreement, but -that would not be eventually an irremediable evil. There would be so much danger in the attempt, and so little prospect of success, that the probability that it would be made at all is very slight. There have been but few, if any, attempts to corrupt a juror in behalf of the prosecution. He must be a very bad man, and such as is seldom found, who would either offer or receive a bribe to condemn an innocent man to an ignominious death on the scaffold. The" probability is too remote to call for a severe and most burthensome restriction. So far as bribes have been detected, they have been generally if not uniformly, in behalf of the accused, and it is not for them to object to a measure because it would furnish to them the opportunity to perpetrate a wrong. Jurors, when allowed to separate during a trial, are generally, and should be always, charged to hold no conversation with any one on any subject relating to such trial. If they are conscientious men they will strictly con *556 form to such charge. Jurors are generally such, or the system of jury trials would be an intolerable evil, rather than a good deserving a constitutional protection. Against a corrupt or easily corruptible juror there can be no absolute safety. Attempts to pervert jurors are seldom made after they are sworn, in either civil or criminal cases. They are less hazardous, and may be equally successful, if made after the entire list is published, and before the jurors are selected for any particular trial. To protect parties absolutely against all improper influences upon the jurors who may be called upon to try their cases the remedial measure would have' to be extended over the entire period from the time when the primary list is published to the termination of the trials. It is better, far better, to have some confidence in the integrity of jurors, and to consider them, as I think they generally are, as worthy to be trusted.
The great improvement in the character, intelligence and position of jurors, and the prolonged trials of modern times, have led to many important and advantageous changes in the method of trying cases, criminal as well as civil, in England. Jurors are no longer coerced into the rendition of verdicts, against the convictions of some of their number, by starvation or transportation from one county to another. Trials in capital, as well as other criminal cases, are adjourned, when necessity requires it, from day to day. That practice was introduced, or at least first expressly, sanctioned, in the case of The King v. Stone, which was a trial for high treason, before the Court of King’s Bench in the year 1796. In ordering the adjournment Lord Kenyon remarked that no rule could compel the court to continue longer sitting than their natural powers would enable them to do the business of it. It is true that the jurors who tried that case were not allowed to separate, but were placed under the charge of bailiffs who were sworn not to speak to them nor suffer any other person to speak to them, touching any matter relative to the trial. That, however, was a case creating great popular excitement favorable to the accused, and for that reason the court may. have deemed *557 it a necessary precaution thus to seclude the jury from the public. It proved ineffectual, however, as the defendant was acquitted; contrary to what appears from the charge of the Chief Justice to have been the decided opinion of the court. Hothing was said in that case indicating rvhat the general practice had been or should be. The old rule requiring the seclusion of the jury during the entire trial has been clearly relaxed in civil actions and cases of misdemeanor in England. In the case of The King v. Woolf and others (1 Chit. Rep., 401), in which there was the trial of an indictment for a conspiracy, Chief Justice Abbott, who presided, allowed the jurors to separate and retire to their families, warning them, however, to have no communication with, any one touching or concerning the matter in issue. The defendants having been convicted a motion for a new trial, by reason of the supposed irregularity in permitting the jurors to separate, was made in the Court of King’s Bench, and the cases were fully discussed by four counsel for the defendants. The court unanimously denied the motion. The Chief Justice said “there are many instances of late years in which juries upon trials for misdemeanors have dispersed and gone to their abodes during the night for which the adjournment took place, and I consider every instance by which that has been done to be proof that it may be” [rightfully] “done.” He said, in conclusion, “it seems to me that the law has vested in the judge the discretion of saying whether or not, in any particular case, it may be allowed to the jury to go to their homes, during a necessary adjournment, throughout the night.” The learned Chief Justice (afterwards Lord Tenterden) was a judge of the old school, and was generally opposed to innovations in the administration of the law. He would not have assented to any change of procedure which he deemed hazardous to the rights of the citizen or of the crown. Judge Bayley remarked that “ where the fact of separation per se is urged as the ground for a new trial it is of no weight.” Judge Holroyd said “I do not find any authority in law which says that the separation of the jury in a case between party and party or in a case of misdemeanor does *558 avoid the verdict,” and Judge (afterwards Chief Justice) Best said “it appears to me, however, that no mischief can result from allowing the jurors to separate, a discretion being always vested in the judge as to the propriety or impropriety of keeping them together in each particular case.” Some of these remarks are of general application, although they cannot probably be considered as authority except in cases of misdemeanor. If, however, there is a power in the courts to abolish or retain the old rules in cases of misdemeanor, it must extend to all criminal cases. I know of no limitationr nor of any reason why there should be one. Whether it should be extended to trials for capital offences is simply a question of expediency arid justice—not of power. In the case of The Commonwealth (Virginia) v. M'Caul (1 Va. Ca., 271), which, was for grand larceny, the attorney-general asked the experienced counsel for the defendant (Mr. Wirt) if he could produce a single case from the English courts in which the separation of one juryman from his fellows was considered sufficient to set aside the verdict. None such was cited, and propably none ' existed. There are undoubtedly cases in some of our sister ' states in which it has been held that a separation of the jury, during the trial of a case of felony, is fatal to a conviction. In the case of The Commonwealth v. M'Caul the court ordered a new trial by reason of the separation of the jury,, but there the separation had taken place without the- consent of the court, which had expressly directed “that the jurors should be kept together.” In the case of The Commonwealth v Roby (12 Pick., 496) Chief Justice Shaw condemned the conduct of the jury where “they had improperly separated themselves.” He referred undoubtedly to cases where they had dispersed upon their own volition without permission from the court. In the case of The State v. Prescott (7 N. H., 287) Judge Parker applied his remarks to a case where there had been an “improper ” separation of the jury. In the case of McLain v. The State (10 Yerg., 241) a portion of the jury had separated from their fellows without being under the charge of an officer and evidently without permission, and a new trial was *559 granted. In Overbee v. The Commonwealth (1 Robinson, 756), Hines v. The State (8 Humph., 597), and McCann v. The State (9 Smedes & Marsh, 465), the separations were without the sanction of the court, and in Boles v. The State (13 Smedes & Marsh, 398), there was an unauthorized intrusion of a barber while the jury was in deliberation. In those cases the courts refer to improper separations of jurors (implying that there may be proper separations) or to circumstances showing their manifest impropriety in those particular instances. In Puffer v. The Commonwealth (3 Harris, 468), Wesley v. The State (2 Humph., 502), and Wiley v. The State (1 Swan, 256), the authority of the courts to permit the separation of the jury during the trial was denied. In Connecticut the separation has been repeatedly sanctioned. (Brandin v. Grannis, in error, Nov. 1811, 1 Conn., 402, note a; The State of Connecticut v. Babcock, Id., 401.) The diversity of opinion and of action in the courts of other States leaves us unembarrassed by their authority in forming and adhering to our own rules of procedure.
In.this State the weight of authority is in favor of the power of the Court to permit a separation of the jury during the trial of a capital case, and of the legality of such separation, when thus sanctioned. In the case of The People v. McKay (18 John., 212), which is usually cited as supporting a contrary doctrine, the question did not arise. One of the questions in that case was whether, where a conviction was set aside because the venire issued by the District Attorney had not been sealed, the defendant could lawfully be subjected to a new trial. To show that he could, Chief Justice Spencer cited a case where a woman of color had been indicted and tried for murder, and found guilty, and a new trial had been granted, after setting aside the verdict because the jury had separated after agreeing upon a verdict and before it was announced. The Chief Justice quoted that case simply to show that where a conviction is set aside for alleged irregularity the defendant can be subject to a new trial without a violation of the principle that life cannot be twice put in jeopardy on the same charge. There was nothing in that *560 case of The People v. McKay calling for the expression of an opinion as to the right to let the jury separate on the trial of capital cases, nor was any expressed. The Chief Justice was not in the habit of expressing opinions upon questions not necessarily involved in the case before him. In the case cited by him the jury had separated after they had deliberated and agreed upon their verdict, and, without the leave of the court, a procedure which has never been sanctioned, although it has not always been deemed fatal to a verdict without proof that it has been prejudicial to the defendant. In the case of The People v. Douglass (4 Cow., 26), where the defendant had been tried on an indictment for murder, two of the jurors during the trial, and after they had leave to retire upon an adjournment, had separated from their associates without the leave, and against the direction, of the court, and, while thus separated, had drank spirituous liquors, and had afterwards returned and had finally united with their brethren in convicting the accused of the capital offence. His counsel moved for a new trial, because, first, the jurors had separated during the trial; and, second, they had imbibed.spirituous liquors which unfitted them for proper deliberation. Both grounds were fully discussed by the counsel and considered by the court; Judge Woodworth, who gave the leading opinion, said that, “ anciently, the utmost rigor and strictness was observed in keeping the j ury together, and when once charged with a cause they never could be discharged till they had agreed upon their verdict, but the practice had been much relaxed in modern times in both those particulars.” “ On looking into the books, we do not find that mere separation of the jury has ever been held a sufficient cause for setting aside a verdict either in a civil or criminal case, if we except, perhaps, the case of The Commonwealth v. McCaul (1 Va. Ca., 271).” “We think that the mere fact of separation, unaccompanied with abuse, should not avoid the verdict, even in a capital case.” “We do mean to be understood as saying that the mere separation of the jury without any further abuse is not sufficient ground for setting aside a verdict, though it may deserve *561 severe reprehension, from, the court.” Judge Sutherland concurred. Judge Savage did not express any opinion as to the effect of the separation of the jury in that case, but he remarked that he “ was not prepared to say that the separation of the jury, without the leave of the court, and mingling with the throng about the court-house, should not affect their verdict.” The inference from this qualified remark would seem to be that, if the separation had been with the leave of the court, that would not, in the opinion of the learned Chief Justice, have vitiated the conviction. Judge Sutherland, in speaking of this case in The People v. Ransom (7 Wend., 423, 424), says that two of the jurors separated from their fellows, drank whiskey, took other refreshments and conversed with the bystanders on the subject of the trial. Upon an application for a new trial for this misconduct of the jury, each of the judges expressed a decided opinion that the mere separa-, tion of the jury, though in violation of their duty and against the express direction of the court, and although in a capital case, would not of itself be a sufficient cause for setting aside' the verdict.” No doubt the learned judge referred to the opinion expressed by the Chief Justice in consultation, in the case of The People v. Douglass, and he could not-have been’ mistaken as to that, although differing somewhat from his reported opinion, as they were still associated on the bench,. and any mistake would have been promptly corrected. Mr. Wharton, in his work on American Criminal Law, in a passage quoted by Judge Selden in the case of Eastwood v. The People (3 Park. Cr. R., 44), says that “ in New York mere separation [of the jurors] without permission appears formerly to" have been prima fade evidence of misbehavior. But the, better opinion now is, that to vitiate a verdict reasonable suspicion of abuse must exist" The decision in the case of The People v. Douglass remained undisputed and was generally considered to be the proper rule of action, when the Revised Statutes of 1830 were passed. It was no doubt known to the revisors, and the Legislature, by whom the revision was made. One of the revisors held, at the seat of our State govern *562 ment, an important office connected with the administration of our criminal laws at the time when the judgment in that case was rendered. The laws passed under the supervision, and upon the recommendation of that learned and active member of the bar and his associates, contained a provision in the following words: “The proceedings prescribed by law in civil cases in respect to the impanneling of juries, the Iceeping them together, and the manner of rendering their verdict, shall be had upon the trial of indictments; and the provisions of law in civil cases, relative to compelling the attendance and testimony of witnesses, their examination, the administration of oaths and affirmations, and proceedings as for contempts to enforce the remedies and protect the rights of parties, shall extend to trials and other proceedings on indictments, so far as they may be in their nature applicable thereto, subject to the provisions contained in any statute.” (2. R. S., 735, § 14.) The revisors, in their original notes, say that “ chapters 7 and 8 of the 3d part relate only to civil cases; this section becomes necessary in order to avoid the repetition of the various provisions embraced in it, and which are equally applicable to criminal cases.” (3 R. S. 2d ed., 848.) The only provision in either of those chapters having any reference to keeping jurors together in civil cases is contained in the 26th section of title 17 of the 8th chapter, which authorizes the court, if the jury cannot agree after being kept together for such time as may be deemed reasonable, to discharge them and to call another jury. It could not have been designed to confine the operation of the 14th section on the 735th page, which I have quoted, simply to a provision authorizing the discharge of juries on a failure to agree after due deliberation. If that had been the sole intent, the provision would have been qualified and restricted by the cautious revisors, as it should have been. The general terms “keeping them together,” have reference to what takes place during the progress of a trial, rather than at its termination.. It happens in this instance, as it does in many other provisions of those statutes, that while professedly reenacting some preexisting law, some more exten *563 sive or even, additional regulation is adopted. It is a safe rule to consider the revisors’ notes as explaining the object, but not as limiting the extent of the law, especially where, as in this case, the language is clear and unambiguous. I think that the intent, and I am clear that the effect, of the provision was to apply the rule as to keeping jurors together on the trial of civil cases, to “the trials of indictments,” and thus affirm what had been in effect decided in the case of The People v. Douglass. The counsel for the plaintiff in error contended that the entire 14th section was subject to the qualification at the end of it, that its provisions, or some portion of them, should prevail so far as they might in their nature bo deemed applicable. Without considering whether the rule relative to keeping the jurors together on the trial of civil actions can be deemed applicable to trials in criminal prosecutions, it is a sufficient answer to this objection that both the frame and the punctuation of that section render what follows the semicolon inapplicable to what precedes it. The counsel also objected to the application of the rule in question to trials in criminal cases, on the ground that it would be an infringement of the trial by j ury as secured by our present State constitution. It is provided by the 2d section of the 1st article that “the trial by j ury in all cases in which it has been heretofore used, shall remain inviolate forever.” That section evidently relates to the cases in which such trials shall be secured, and not to the mode of procedure. It does not preclude a change in the practice in such cases, so long as the substantial features of a jury trial are preserved. But it is a sufficient answer to that objection that our present constitution was adopted many years after the passage of the Revised Statutes, and that the expression “heretofore used” applied to the date of the adoption of the organic law, and not to any antecedent period.
If there had been any doubt as to the power of the court by its own volition to permit the separation of the jury on a trial for murder, it appears to me that this case is released from any difficulty of that kind by the admitted fact that such separation was by the consent of the plaintiff in error, and, *564 there is strong reason to believe, on the application of his counsel. It has been frequently remarked in the cases that a prisoner on trial for his life cannot, -with propriety, be asked to give his assent to the separation of the jurors, as he might thereby be subjected to the dilemma of either submitting to a hazardous relaxation of a valuable privilege, or of prejudicing the jurors against him by subjecting them to a long confinement. It is doubtful whether the refusal wouldinduce any juror—it certainly would not a conscientious one—to convict one for so serious an offence without sufficient evidence, or that it would have any effect whatever upon the verdict. But this objection is wholly inapplicable where, as in this case, the consent is tendered without any solicitation. It is a general rule that voluntary consent will cure any error except one applicable to the jurisdiction of the court, or the organization of the jury. It is true that the court is bound to see that the accused, in a case involving his life, is not drawn in to give his assent to a procedure which will probably be prejudicial to him. But when the prisoner thus circumstanced, and having able and zealous counsel, without persuasion, solicitation or undue influence asks for or assents to a procedure, and there is action consequent upon his consent or request, which might not otherwise have taken place, it seems to me that upon every principle of justice or right he should be bound by his conduct. It is clear that, the accused may give and be bound by his consent in a matter directly involving his life. He may, when arraigned, confess his guilt, and thereby waive his right to a trial, and upon that he may be sentenced and executed. Surely if he may dispense with a trial altogether, he may waive any subordinate particular. Consents are frequently given, on trials for murder as well as other crimes, to the admission or rejection of jurors and as to the admission of evidence or of facts, and they are always considered as effectual and binding. In the case of Bebee v. The People (5 Hill, 32), where the trial in a criminal case which had been commenced before a jury, had been suspended, at the instance of the accused, for .the space of three days, *565 during which time the jury had been separated, and the defendant, who was eventually convicted, objected on a certiorari, to the separation, Chief Justice Nelson, in giving the opinion of the court, said that “in respect to the delay of the trial and separation of the jury, it is not for the prisoner to take advantage of the irregularity, as the indulgence was granted on his application and for his benefit. In the case of The People v. Rathbun (21 Wend., 512), which was on a charge of felony, the court, after quoting the maxim quilibet potest renunciare juri pro se introducto, remarked that “the prisoner may even waive his trial at the hands of a jury on the merits by pleading guilty. Having this power no one will pretend that he cannot consent to anything less. He may waive any matter of form or substance, excepting only what may relate to the jurisdiction of the court.” “A man cannot legally be indicted and tried as accessory to a felony till the principal bo convicted. Such a trial is contrary to an ancient and fundamental principle of law;” yet, says Lord Coke, “if he go to trial without insisting on the objection he shall be holden to have waived it.” There can be no sound reason why these principles should not be deemed applicable to trials for capital offences. That such trials should be conducted cautiously, and with great regard to the rights of the accused, may well be admitted, but there can be no good reason why in such cases the court should deny the existence, or refuse the application, of principles consonant to common sense and the ordinary course of justice. The public has rights as well as the accused, and the protection and safety of the innocent require that those rights should be sternly maintained. There has been no decision in this State since the case of The People v. Douglass, denying the power of the court to allow the jury to separate during the trial of a capital case. It was, in effect,, admitted in the case of Eastwood v. The People (3 Park. C. R., 25). It was decided in that case, however, that when a separation has been allowed, a subsequent conviction cannot be sustained without proof on the part of' the prosecution that there has been no abuse. With great respect, it seems to me *566 that the onus of proving the abuse of an acknowledged power rests upon the party raising the objection. It would be better to deny the existence of a power altogether, than to make the valid execution of it dependent upon the almost impossible proof of a negative. I am aware that it may be difficult to prove an abuse, as it may be known only to the perpetrators, who would of'course be most reluctant to disclose it; but on a charge of abuse there would a definite issue, whereas, on the other hand, the surmises would be so vague and uncertain that it would be impossible to meet them. In most cases it would be beyond the compass of human possibility to prove that there had been no abuse.
Since the decision of the court of the highest original criminal jurisdiction in the case of The People v. Douglass, and the adoption of our Revised Statutes, it has, I think, been the universal practice to allow the jurors to disperse and go to their families on the trials of indictments for felonies not capital. To that extent the old rule has been clearly relaxed. The practice in capital cases has not been uniform. Many of the judges have allowed the jurors to separate, while others have confined them during long and tedious trials. During an experience of ten years on the bench I have allowed the jurors to separate in all cases, civil and criminal, where an adjournment during the trial became necessary. Four persons have been tried and convicted of murder before me, and sentenced to be executed. In those cases the separation, it is true, was with the consent of the accused. It furnishes some evidence that the practice in their cases was not productive of injustice, that there has not been in either of them a pardon, a commutation of punishment, or a new trial. I am not aware that in any case, capital or otherwise, the separation of the jury has been prejudicial to the ends of justice. So far as my inquiries have extended, and they have been considerable, such is the impression of all who have pursued the sapie practice. It cannot be denied that the separation of the jurors during the trial furnishes additional facilities for improper attempts to influence them, and bad men may sometimes feel inclined to *567 encounter the hazard of making such attempts, although as I have before remarked, seldom if ever in behalf of the people. But the probability of such improper action is very slight— of its success there would be a mere possibility. The consequent apprehension of evil is too slight to call for the revival or continuance of a most incommodious procedure; and one, too, founded upon a suspicion that reliance cannot be placed upon the sense of justice and firmness of those who are intrusted, both by our organic and statute laws, to decide questions involving the property, the liberty, and the lives of their fellow-men. Buies, restrictive of the freedom of human action, and especially such as subject the innocent and the unsuspected of crime to confinement, can only be justified by the most urgent necessity; and certainly such necessity cannot be inferred from the mere possibility that a juror may be improperly approached and misled, if allowed his liberty occasionally during the progress of a long trial. Upon the whole I am satisfied that the decisions of the Supreme Court, the provision in our Bevised Statutes, the interests of our fellow-citizens, who are called upon to act as jurors, require, and the ends of justice allow, that the procedure which I have been considering should be sustained. In the absence of any positive and unyielding principle of law hostile to the rule, we cannot be called upon to repudiate it, especially in a case where the merits do not call for our interference, and thus declare that many who have been incarcerated in our State prisons, and some who have perished on the gallows, have been illegally convicted. Upon full consideration we all, but my brethren Selden and Cray, agree that under the circumstances the conviction has not been vitiated by the separation of the jury during the progress of the trial in the absence of any satisfactory proof that it has been accompanied by any abuse prejudicial to the accused.
The authorities all agree that wherever there has been any irregularity prejudicial to the prisoner, consequent upon the separation of the jury during his trial, a verdict against him should not be permitted to stand. Such irregularity and such *568 prejudice have been alleged in this case. Some of us think that the question of irregularity could be reviewed only in the court below, but in a case of so much importance it may be more satisfactory that it should be considered here, especially as it has been frequently discussed in the courts of dernier resort in other states. A deposition of Edward Murray was produced, on the motion for a new trial, stating that he had heard Doctor Doremus, a chemist who had been examined in behalf of the prosecution, say to one of the jurors out of court that one of the counsel for the prisoner had misrepresented him in the remarks which that counsel had made to the jury in reference to the Doctor’s analysis; and that such deponent saw another juror in conversation with the doctor, also .out of court, in which that juror stated that he had been ■informed by a physician that such analysis was the most complete of any which he had ever seen. The accuracy of the ■analysis seems to have been made a question, and probably it was an important one, on the trial; any statements as to that may have been material, and, although made out of court and ■not under the obligation of an oath, might have had some influence upon the minds of the jurors adverse to the defendant, although there is no positive proof that they operated injuriously to him. But the 'statements made by the deponent, Murray, were denied in depositions made by the doctor and ■the two jurors. It is true that they were the persons implicated, and were interested in disproving the charges. The .question as to the relative credibility of the persons who made the depositions was however proper for the consideration of the Court of Oyer and Terminer, and the decision of that tribunal which must have been favorable to the doctor and the two jurors, cannot be reviewed upon a writ of error or bill of exceptions. It is objected, however, that those persons while negativing the specific charges do not deny all impropriety of a similar character. But it is a general rule, that one whose conduct has been arraigned can only be required to meet the charges actually preferred against him. If he should go further he might subject himself to the operation of *569 the maxim that Uqui s’excuse s’accuse.” We think that the allegation of irregularity in the jurors while out of court should not and cannot, under the circumstances, avail the plaintiff in error.
Many exceptions were taken on the trial to the decisions of the judge in the admission or exclusion of evidence, and some to the positions taken by him in his charge to the jury. Several of those were candidly abandoned by the counsel for the plaintiff in error on his argument before us, others do not seem to require any answer, and I shall consider those only upon which the greatest reliance was placed by that learned advocate.
The prosecution introduced evidence to show that the accused had formed an attachment to Sophia Bell, a niece of his wife, and was desirous of forming a matrimonial connection with her—for the purpose of proving an inducement with him to get rid of the deceased, as an obstacle to the accomplishment of his wishes. The prisoner’s counsel asked one of his own witnesses what was the conduct of Sophia Bell toward the prisoner. The question was rejected by the court on the objection of the counsel for the prosecution. The court ruled that the inquiry should be confined to the period of the last illness of the deceased. The same witness was also asked by the prisoner’s counsel, whether, from his observation, Sophia Bell was more anxious to see the prisoner than he was to see her. That question was also rejected by the court, at the instance of the counsel for the prosecution, the judge saying, however, that the prisoner would have a right to prove facts tending to show which of the two had the greater passion for the other. The same witness was further asked by the counsel for the prisoner, what was the general conduct of Sophia Bell towards him and whether it was that of a modest retiring girl, or of a bold, forward and impudent woman. That question was also ruled out, but the judge said that the proper question was as to any acts or expressions of the girl relative to or towards the prisoner. The witness then said he observed her “ very much going after the defendant, and that *570 she was in the habit of loitering about the church, watching him in the lobbies and doorway.” The questions which were thus asked and rejected were undoubtedly too general, and called for the opinions of the witness rather than the statement of the facts known by him. The judge permitted the witness to testify as to the acts and expressions of Sophia Bell, a,nd eventually during the two years preceding the death of Mrs. Stephens. Surely an investigation beyond that period would have been too remote. The object of the inquiry seems to have been to show that the young woman had formed and indiscreetly exhibited a strong attachment for the prisoner. How that, if proved, could have benefited him as to the imputed motive to get rid of his wife it is difficult to imagine. It would seem to have a tendency to strengthen the motive and to encourage the commission of the crime. If the object of the rejected inquiries was to discredit the girl, who had been one of the principal witnesses for the prosecution, the questions were clearly inadmissible. A witness cannot be discredited by proof of particular acts not directly involved in the issue on trial, much less by an opinion as to their general character or tendency. The questions were properly excluded, and it is unnecessary to decide whether, if there had been mistakes in rejecting them, the errors would have been cured by the consent, in the subsequent part of the trial, that they might be asked and answered.
The counsel for the prisoner offered in evidence the depositions of Sophia Bell and Fanny Bell, made before the coroner, for the purpose of discrediting their testimony on the trial. The court decided that such parts of the deposition of each of those witnesses as had been called to her attention during her examination on the trial might be read, but that the rest should be rejected. In this I think the court ruled correctly. Clearly, if it was designed to discredit the witnesses by showing that their evidence before the coroner differed from that given by them on the trial, they should have been previously furnished with an opportunity for explanation. But if the court had erred in rejecting the depositions, the error would *571 have been cured by the subsequent admission of those papers in evidence. The eventual admission in evidence of a written document cures any error in previously rejecting it, unless it should be one which could be corrected-in the particular for which it had been offered, by extrinsic evidence; which could not have been done in this instance. In the case of The People v. Hendrickson (1 Park. Cr., 40), quoted by the counsel for the plaintiff in error, the deposition had been made by the defendant, and it was read as a confession by him. It was admissible as such although it might not have been proper without a preliminary examination, if the object had been to discredit a witness.
The counsel for the accused objected to the admission in evidence of an anonymous letter, proved to be in his handwriting, addressed to a person to whom Sophia Bell was about to be married, and received by that person at the time of its date, which was about eleven months after the death of Mrs. Stephens, as too remote in date. If it is reasonable to suppose that the motive attributed to the prisoner, or a disappointment at his failure to accomplish his object, had continued for so long a time—and I think it is, for love and jealousy are generally conceded to be enduring passions—then the letter was proper evidence for the consideration of the jury. The counsel also objected to the comments oí the judge in reference to the letter in his charge to the j ury. The remarks of the learned judge were certainly very strong, but they were mere comments upon the weight of evidence, and as such they are not the subject of review on a writ of error. The jury were properly instructed that they were the sole judges upon all questions of fact, as to which they should adopt their own conclusions.
An objection was raised, on the trial, to the refusal of the court to issue an attachment to compel the attendance of an absent witness, who had 'been subpenaed in behalf of the accused, and had been in attendance during a part of the trial. When the application for an attachment was made the counsel on both sides had, in effect, announced that the testimony was *572 closed and they had made an arrangement, with the assent of the court, as to the order in which they should address the Jury. At that stage of the trial and under such circumstances it was discretionary with the judge whether to grant or refuse the attachment, and his determination, if it had been objectionable, which we do not think it was, cannot be reviewed here.
It was proved on the trial that when the prisoner and his brother-in-law were together, a short time previous to the death of Mrs. Stephens, a quantity of arsenic had been purchased by one of them; and three of the defendant’s witnesses, Susan Hannah, Isabella Bennett and Maria Hannah, had testified, on their cross-examination, that it had been administered to rats which had infested a cellar in which provisions were stored. To rebut this tfye counsel for the prosecution proposed to prove, by Jane Henry, that no provisions had been kept in such cellar. The counsel for the prisoner objected to the admission of such evidence on the ground that it was as to a collateral matter, and in effect introduced by the prosecution. It was, however, admitted by the court. As the charge was for poisoning the deceased by the administration of arsenic, the inquiry as to the disposition of arsenic purchased by the prisoner or his associate, shortly before her death, was not strictly collateral; and, therefore, the prosecution was not concluded by the statements as to that made by .the witnesses for the defendant, whether on a direct or cross-examination.
Two of the witnesses for the prosecution, Henry Maxwell and Charles Mulholland, testified that they had never seen anything improper in the conduct of Sophia Bell or Fanny Bell at the Methodist church in Twenty-seventh street. A motion was made in behalf of the prisoner and denied by the court, to strike out the testimony of these witnesses. The prisoner’s counsel had introduced evidence to show that the two girls had conducted themselves indecorously and indecently in that church, while engaged there as sabbath school teachers. Maxwell was the local minister, and Mulholland was *573 a member of the church, and they had frequently seen the girls at the church. Their testimony was competent to rebut what had been proved on the same subject in behalf of the defendant. The testimony as to the conduct of the girls at the church does not seem to have been very important, but it is not right that any one should sustain an objection to evidence on the ground of irrelevancy which was introduced to rebut evidence on the same subject adduced by himself.
The admission of William Knox as a witness for the prosecution, who was called to rebut some of the defendant’s testimony, was objected to on the ground that the counsel for the prosecution had been required and had refused to call him before the evidence on behalf of the people had been closed. It was undoubtedly discretionary in the court whether to admit or reject the witness, and, therefore, there was no exceptionable error in admitting him.
The questions propounded by the prisoner’s counsel to John Bisco, one of the coroner’s jury, whether the deponent did not charge the coroner publicly with having refused to subpoena witnesses agreeably to his request, and with having refused to allow those who had been sworn to testify what they knew, had no relevancy to the subject matter of the trial and were properly rejected.
An objection was also raised by the prisoner’s counsel to the testimony of the coroner’s clerk. He testified that he had taken down the evidence of each witness correctly; that he had read it over to the witness, and that such witness had then signed his or her name to the written deposition. He was then allowed to state the evidence of each witness from the deposition. The prisoner’s counsel contended that the coroner’s clerk should make his statements from his recollection as refreshed from perusing the papers and not from the papers themselves. The court decided otherwise, and beyond all doubt correctly. The papers were not mere memoranda made by the clerk to help his recollection, but wrcre depositions signed by the witnesses after they had been deliberately read over to them, and they had been requested to make or *574 Suggest alterations if they were in correct. They were introduced to impeach the credibility of the witnesses without any objection that their attention had not been previously called to the portions of their evidence which were selected for that purpose, and so far they were competent, if not the only admissible evidence.
Thinking as we do that all the objections raised in behalf of the plaintiff in error are untenable, the judgment against him must be affirmed.
All the judges except Sellen and Gray, Js., who dissented, agree that there was no error in law in allowing the jury to separate, the prisoner having assented thereto.
Comstock, Allen and Grover, Js., were also of opinion that the court has the power to permit a separation of the jury in its discretion, and independent of the consent of the parties. On this point Johnson, Oh. J., and Denio, J., expressed no opinion.
Judgment affirmed.